No. 22-3160

In the

# United States Court of Appeals
## for the Seventh Circuit

---

UNITED STATES OF AMERICA,
                                    Plaintiff-Appellant,

v.

JOHN HOLDEN,
                                    Defendant-Appellee.

---

On Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:22-CR-30  —  Hon. Robert L. Miller, Jr., *Judge*.

---

## BRIEF AND APPENDIX FOR THE UNITED STATES

---

CLIFFORD D. JOHNSON
United States Attorney

DAVID E. HOLLAR
Assistant United States Attorney
Chief, Appellate Division

United States Attorney's Office
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
(219) 937-5500

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................iii

JURISDICTIONAL STATEMENT ................................... 10

STATEMENT OF ISSUES............................................... 11

STATEMENT OF THE CASE ........................................... 11

SUMMARY OF THE ARGUMENT .................................. 16

ARGUMENT ................................................................... 17

I.  Holden Cannot Defend Against His False Statements
    Prosecution By Challenging the Constitutionality of the
    Underlying Requirement Embodied in 18 U.S.C. § 922(n) ........ 17

    A.  The Supreme Court and this Court have long held one
        may not defend against a charge of lying by attacking
        the government's right to ask the question....................... 17
    B.  Nothing in the Second Amendment or the text of 18
        U.S.C. § 922(a)(6) counsels a different result here. .......... 20

II. Regardless, 18 U.S.C. § 922(n) Is Constitutional........................ 24

    A.  The *Bruen* framework and burdens of proof. ..................... 24
    B.  Because those under indictment are not "ordinary, law-
        abiding adult citizens," the Second Amendment does
        not presumptively protect their right to bear arms........... 25
    C.  Section 922(n) is consistent with the nation's historical
        tradition of gun regulation. ................................................ 32

    i.   Section 922(n) is analogous to historical laws
         detaining indicted defendants prior to trial. ...................... 34
    ii.  Section 922(n) is analogous to historical laws
         disarming dangerous or untrustworthy people................. 39
    iii. Section 922(n) is analogous to historical surety laws........ 44

i

D.     At minimum, 18 U.S.C. § 922(n) is constitutional facially and as applied to Holden ....................................... 48

CONCLUSION ................................................................ 50

RULE 32 CERTIFICATION ........................................... 51

APPENDIX .................................................................... 53

# TABLE OF AUTHORITIES

## CASES

*Abramski v. United States*, 573 U.S. 169 (2014) ............................................. 14

*Baze v. Rees*, 553 U.S. 35 (2008) ..................................................................... 27

*Beck v. Ohio*, 379 U.S. 89 (1964) ..................................................................... 20

*Bell v. Wolfish*, 441 U.S. 540 (1979) .......................................................... 21, 22

*Bryson v. United States*, 396 U.S. 64 (1969) ................................... 9, 11, 12, 13

*Carlson v. Landon*, 342 U.S. 524 (1952) ......................................................... 25

*Cases v. United States*, 131 F.2d 916 (1st Cir. 1942) ...................................... 38

*Clark v. Community for Creative Non-Violence*, 486 U.S. 288 (1984) ........... 16

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ................................. 21

*Dennis v. United States*, 384 U.S. 855 (1966) ........................................... 10, 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................ passim

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..................................... 9

*Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012) ...................... 21

*Furman v. Georgia*, 408 U.S 238 (1972) ......................................................... 26

*Graham v. United States*, 2012 WL 611852 (N.D. Ind. Feb. 24, 2012) ........... 13

*Hill v. Murphy*, 785 F.3d 242 (7th Cir. 2015) ................................................... 9

*Kaley v. United States*, 571 U.S. 320 (2014) ................................... 21, 22, 27, 29

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ............................................. 9, 39

*Kay v. United States*, 303 U.S. 1 (1938)............................................................. 10

*McDonald v. City of Chicago*, 461 U.S. 742 (2010) ......................................... 17

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019)............................ 19, 26, 27

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ..................................... 23, 31, 32, 33

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).....passim

*Sir John Knight's Case,* 87 Eng. Rep. 75 (K.B. 1686) ..................................... 30

*State v. Holden,* No. 71D02-2103-F6-201 (St. Joseph Super. Ct. Mar. 2, 2021) .............................................................................................. 3

*Teixiera v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ......................... 12

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) ..................................... 20

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ........................... 20

*United States v. Dillon*, 150 F.3d 754 (7th Cir. 1998).................................... 14

*United States v. Edwards*, 430 A.2d 1321 (D.C. 1981) ................................... 25

*United States v. Fencl*, No. 21-CR-3101, JLS, 2022 WL 17486363 (S.D. Cal. Dec. 7, 2022) ...........................................................................passim

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) .................. 32

*United States v. Johnson*, 42 F.4th 743 (7th Cir. 2022) ................................... 8

*United States v. Kapp*, 302 U.S. 214 (1937) ........................................ 10, 11, 13

*United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022).................................................................... 25, 37

*United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ............................................................. 24, 25, 30

*United States v. Knox*, 396 U.S. 77 (1969).............................................................. 8

*United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y. 2011) ....................... 35

*United States v. Lawton*, 366 F.3d 550 (7th Cir. 2004) ............................... 6, 10

*United States v. Mandujano*, 425 U.S. 564 (1976)............................................. 9

*United States v. Monsanto*, 491 U.S. 600 (1989).............................................. 27

*United States v. Moore*, 446 F.3d 671 (7th Cir. 2006)...................................... 10

*United States v. Peeples*, 630 F.3d 1136 (9th Cir. 2010).................................. 29

*United States v. Perez-Garcia*, No. 22-CR-158-GPC, 2022 WL 17477918
  (S.D. Cal. Dec. 6, 2022) ........................................................................ 25, 37

*United States v. Perry*, 788 F.2d 100 (3rd Cir. 1986)...................................... 25

*United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240
  (5th Cir. Feb. 2, 2023)................................................................ 18, 29, 33, 37

*United States v. Robinson*, 414 U.S. 218 (1973)............................................... 21

*United States v. Rowson*, 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023)....... 25, 39

*United States v. Salerno*, 481 U.S. 739 (1987) .............................. 21, 22, 29, 39

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)..................................... 34

*United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732
  (W.D. Pa. Oct. 6, 2022) .......................................................... 25, 26, 28, 30

*United States v. Stephens*, 594 F.3d 1033 (8th Cir. 2010) ................... 26, 27, 28

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)................................ 19

*United States v. Watson*, 423 U.S. 411 (1976)................................................. 20

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ....................... 18

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021)........................................ 35, 36

## CONSTITUTION AND STATUTES

U.S. Const. amend. II ..................................................................... 15

First Amendment ......................................................................... 22

1 Acts and Resolves, Public and Private, of the Province of
  assachutes  Bay (1869)  .......................................................... 31, 36

1 Laws of the State of Delawarefrom the Fourteenth Day of October,
  One Thousand Seven Hundred, to the Eighteenth Day of August,
  One Thousand Seven Hundred and Ninety-Seven (1797).......................... 36

1 Laws of the State of North-Carolina, including the Titles of Such
  Statutes and Parts of Statutes of Great Britain as Are in Force in
  State State (1821) .................................................................. 31

1 The Public Acts of the General Assemply of North Carolina (1804) ........... 32

2 Statutes at Large of Pennsylvania (1896)...................................... 36

5 The Acts and Resolves, Public and Private, of the Province of
  Massachusetts Bay (1886)......................................................... 32

7 Records of the Colony of Rhode Island and Providence Plantations, in
  New England (1776) ............................................................... 32

9 Statutes at Large; Being a Collection of All the Law of Virginia (1821)..... 32

9 Statutes at Large of Pennsylvania (1779)...................................... 32

18 U.S.C. § 922(a)(6) ...........................................................passim

18 U.S.C. § 921(a)(14) ............................................................ 3

18 U.S.C. § 922(d)(1) ............................................................ 14

18 U.S.C. § 922(g)(8) .......................................................... 20, 29

18 U.S.C. § 922(n) ................................................................................passim

18 U.S.C. § 924(a)(1)(A) ................................................................. 6, 10

18 U.S.C. § 1001 ....................................................................................... 11

18 U.S.C. § 3142(c)(1)(B)(viii).................................................. 3, 22, 28

18 U.S.C. § 3231 ......................................................................................... 1

18 U.S.C. § 3731 ......................................................................................... 1

18 U.S.C. §§ 921-934................................................................................ 14

Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789) ...................... 26

Acts and Law of His Majesties Colony of Connecticut in New-England
    (1901) .................................................................................................. 37

Acts and Law of His Majesty's Province of New Hampshire:  In New
    England (1771) ................................................................................... 36

Acts and Law of His Majesty's Province of New Hampshire:  In New
    England; with Sundry Acts of Parliament (1771) ....................... 31

Ariz. Rev. Stat. § 13-311(E)(3) ........................................................... 18

Collection of All Such Acts of the General Assemply of Virginia, of a Public
    and Permanent Nature, as Are Now in Force (1794) .................. 31

Compilation of the Statutes of Tennessee of a General and Permanent
    Nature, from the Commencement of the Government to the Present
    Time (1836) ........................................................................................ 32

Ill. Comp. Stat. § 66/25(4) ................................................................... 18

Ind. Code § 35-33-2-19(b)-(c) .............................................................. 3

Ind. Code § 35-42-2-1(c)(1)................................................................... 3

Ind. Code § 35-42-2-1(e)(2) ................................................................. 3

Ind. Code § 35-47-2-3(i)(5) ..................................................... 19

Ind. Code § 35-50-2-7 ........................................................ 3, 4

Ky. Rev. Stat. § 237.110(4)(a) ............................................... 19

La. Stat. § 40:1379.3(C)(1) ................................................... 19

Mass. Rev. Stat., ch. 134, § 16 (1836) .................................. 37

Militia Act of 1662, 13 & 14 Car. 2, c.3 § 13 (1662) ........................ 30

Rutgers, New Jersey Session Laws Online, Act of the General Assembly of the State of the New Jersey (1777) ................................. 32

Tenn. Code § 39-17-1351(c)(7) .............................................. 19

## RULES

Fed. R. App. 4(b)(1)(B)(i) ..................................................... 2

## OTHER AUTHORITIES

4 William Blackstone, Commentaries on the Laws of England (1769) ............................................................... 35, 36, 37

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the State of the American Union (1st ed. 1868) ................................................ 34

David Feldman, *The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers,* 47 Cambridge L.J. 101 (1988) ..................................................... 36

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) ....................................................... 31

Sandra G. Mayson*, Dangerous Defendants*, 127 Yale L.J. 490 (2018) .......... 26

William Rawle, *A View of the Constitution of the United States of* America, 126 (2d ed. 1829) ............................................................................... 36

2 Bernard Schwartz, *The Bill of Rights:  A Documentary History* (1971) ..... 31

George Webb, *The Office and Authority of a Justice of Peace* (1736) ............ 36

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 22-3160

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

JOHN HOLDEN,
Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Northern District of Indiana

_____

BRIEF FOR THE UNITED STATES

_____

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231 over this
federal criminal prosecution. This Court has jurisdiction under 18 U.S.C. §
3731 over the United States' appeal from the district court's decision
dismissing the indictment. R. 32 (App. 1-17).[1] The district court entered its

---

[1] Citations to the district court record are designated "R." The change of plea
transcript (R. 26) is "Plea." The appendix attached to this brief is "App."

dismissal order on October 31, 2022. R. 32. The government timely filed its notice of appeal on November 30, 2022. R. 33. See Fed. R. App. 4(b)(1)(B)(i).

## STATEMENT OF ISSUES

A federal statute, 18 U.S.C. § 922(a)(6) (App. 19-20), prohibits making a materially false statement in connection with a firearms purchase. A second statute, 18 U.S.C. § 922(n) (App. 21), prohibits a person under felony indictment or information from receiving a firearm. While trying to buy a firearm, Holden falsely stated on a federal form that he was not under felony indictment or information.

The district court dismissed an indictment charging that Holden violated Section 922(a)(6). Construing *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), it concluded Holden's false statement was not material because Section 922(n) unconstitutionally violates the Second Amendment.

1. Did the district court err in allowing Holden to defend against a Section 922(a)(6) charge on the ground that the question that prompted his false statement violated his constitutional rights?

2. Alternatively, did the district court err in holding that Section 922(n) violates the Second Amendment?

## STATEMENT OF THE CASE

Title 18, Chapter 44, of the United States Code places restrictions on the ability of persons to possess or acquire firearms. Among those restrictions is a

law prohibiting anyone charged by indictment or information with a crime punishable by a prison term of one year or more from shipping, transporting, or receiving a firearm. 18 U.S.C. § 922(n); see also 18 U.S.C. § 921(a)(14) (defining "indictment" in Section 922(n) to include a felony information). Section 922(n) does not prohibit those under indictment or information from possessing firearms already owned, though the Bail Reform Act grants federal courts the authority to prohibit possession by those released pending trial where that condition is necessary to ensure "the safety of any other person or the community." 18 U.S.C. § 3142(c)(1)(B)(viii).

In March 2021, the State of Indiana filed a probable cause affidavit and an information charging Holden with battering a public safety official, in violation of Ind. Code § 35-42-2-1(c)(1). Plea 12; *State v. Holden*, No. 71D02-2103-F6-201 (St. Joseph Super. Ct. Mar. 2, 2021), *available at* https://mycase.in.gov (last visited Feb. 7, 2023). Indiana classifies this crime as a Level 6 felony, punishable by up to two and a half years in prison. See Ind. Code § 35-42-2-1(e)(2); Ind. Code § 35-50-2-7.

In the Indiana state courts, once the government files an information, a judge may issue an arrest warrant only after first finding from the affidavit that probable cause exists to conclude that the person committed the crime. Ind. Code § 35-33-2-1(b)-(c). The St. Joseph Superior Court issued an arrest warrant for Holden. *Holden*, No. 71D02-2103-F6-201. He was arrested the next

day and released on bond. *Id.* (Mar. 3, 2021). Trial was set for October 28, 2021. *Id.* (July 19, 2021).

On August 11, 2021, while on bond, Holden tried to buy a firearm at Worldwide Jewelry & Pawn. App. 1; Plea 11. Worldwide is a "licensed dealer of firearms" as that term is defined in Title 18, Chapter 44. App. 1; Plea 11. Holden completed ATF Form 4473. App. 2. On the form, he falsely stated he was not currently under indictment or information in any court for a felony offense. App. 2; Plea 11. Holden knew the statement was false based on his pending battery charge. Plea 11-12.

In April 2022, a grand jury returned a one count indictment charging Holden with violating 18 U.S.C. § 922(a)(6). R. 1. That statute criminalizes knowingly making a false statement "intended or likely to deceive [a licensed dealer] with respect to any fact material to the lawfulness of the sale or other disposition of [a] firearm or ammunition under the provisions of this chapter [i.e., Title 18, Chapter 44]." 18 U.S.C. § 922(a)(6).

The indictment specifically alleged that Holden "knowingly made a false and fictitious statement … that was intended and likely to deceive Worldwide … as to a fact material to the lawfulness of the sale of the firearm to the defendant under Chapter 44 of Title 18." R. 1, at 1. The indictment identified Holden's false statement as his "represent[ation] that he was not under indictment or information in any court for a felony offense." R. 1, at 1.

Holden initially pled guilty. R. 18; Plea 1-22. But in September 2022 he moved to withdraw his plea and dismiss the indictment. R. 24. He argued that 18 U.S.C. § 922(n) violates the Second Amendment as construed in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). R. 24, at 3-6. He further contended that, due to Section 922(n)'s purported unconstitutionality, his false statement about being under a felony information was immaterial to the lawfulness of the firearm's sale and thus did not violate Section 922(a)(6). R. 24, at 6-7

The district court granted the motion and dismissed the indictment. App. 1-17. The court first held that Section 922(n) facially violates the Constitution. App. 4-10, 15. It deemed Holden's attempt to receive a firearm "presumptively protected by the Second Amendment" because "[r]eceiving a firearm is necessarily a precursor to keeping or bearing a firearm." App. 6.

Next, the court concluded the government failed to affirmatively show that restricting those under indictment from acquiring firearms was consistent with "the history and tradition of firearms regulations." App. 6-7, citing *Bruen*, 142 S. Ct. at 2127. While prohibitions akin to Section 922(n) were first enacted through the Federal Firearms Act of 1938, that enactment occurred too long after the Second Amendment's 1791 ratification to "shed much light on the [Amendment's] original public meaning." App. 7. The court also rejected the government's efforts to analogize Section 922(n) to nineteenth century surety

laws because surety laws provided exceptions while "Section 922(n) imposes an absolute prohibition." App. 9.

Finally, the court concluded (App. 10-15) that Holden's admittedly false statement to Worldwide "was immaterial for purposes of § 922(a)(6)." App. 15; see also App. 11. It rejected the government's reliance on *United States v. Lawton*, 366 F.3d 550, 553 (7th Cir. 2004), a prosecution under another firearms statute (18 U.S.C. § 924(a)(1)(A)) where this Court declared that the government could prosecute a defendant making a false statement "even if there are doubts about the government's authority to pose the inquiry giving rise to that statement." App. 12. The district court concluded Section 924(a)(1)(A) swept in a "broader class of statements" and conduct than did Section 922(a)(6). App. 13. In the district court's view, Holden's false statement was not material because—assuming Section 922(n) was unconstitutional— "the question of whether the purchaser is under indictment could receive no answer affecting the lawfulness of the sale." App. 14.

Despite dismissing Holden's indictment, the district court expressed "an earnest hope" that it had "misunderstood" *Bruen*, for "[i]f not, most of the body of law Congress has developed to protect both public safety and the right to bear arms might well be unconstitutional." App. 16; see also *ibid* ("[T]he author of this opinion retains hope that he hasn't accurately grasped the Supreme Court's understanding of the Second Amendment.")

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing Holden's indictment. Whatever other means might be available to challenge Section 922(n)'s constitutionality, a Section 922(a)(6) prosecution is not one of them. Longstanding precedent holds that a person who provides false information in response to a government question cannot defend against a criminal charge on the ground that asking the question violated the Constitution. Holden therefore cannot raise Section 922(n)'s purported unconstitutionality as a defense in his Section 922(a)(6) prosecution. Stripped of that defense, Holden's acts violated the statute. His lie was "material" because a truthful response would have prevented the firearm sale from going forward.

Regardless, Section 922(n) is constitutional. The provision does not restrict the right of ordinary, law-abiding citizens to bear arms for self-defense, the concern in *Bruen* and its predecessors. Instead, Section 922(n) only prevents those found to have probably committed serious crimes from acquiring firearms. To the extent *Bruen* requires the government to show that Section 922(n) is consistent with historical tradition, that burden is met. In colonial times, those charged with what are modern-day felonies were routinely detained pending trial, analogously justifying the lesser restriction of pretrial release coupled with a prohibition on buying firearms. England and early America also permitted the disarming of those deemed dangerous or

untrustworthy and imposed surety requirements on those reasonably accused of posing a societal threat. These early analogues further support Section 922(n)'s restrictions. At minimum, they show that the statute is not unconstitutional facially or as applied to Holden, who was accused of battering an officer. This dangerous act justifiably precluded him from acquiring arms.

## ARGUMENT

### I.  Holden Cannot Defend Against His False Statements Prosecution By Challenging the Constitutionality of the Underlying Requirement Embodied in 18 U.S.C. § 922(n).

This Court reviews de novo legal questions, such as a statute's constitutionality or textual interpretation. *United States v. Johnson*, 42 F.4th 743, 746 (7th Cir. 2022).

### A.  The Supreme Court and this Court have long held one may not defend against a charge of lying by attacking the government's right to ask the question.

The district court erred in dismissing the indictment because, regardless of whether Holden had a right to acquire a firearm while under felony indictment, he had no right to make false statements in the process of doing so. The law is well established that a person "who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." *United States v. Knox*, 396 U.S. 77, 79 (1969). As the Supreme Court has explained, "it cannot be thought that as a general principle

of law a citizen has a privilege to answer fraudulently a question that the Government should not have asked." *Bryson v. United States*, 396 U.S. 64, 72 (1969). "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." *Ibid.*

Had Holden wished to challenge Section 922(n)'s prohibition on acquiring a firearm while under felony indictment, he could have filed a civil suit invoking federal question jurisdiction. See, *e.g.*, *Kanter v. Barr*, 919 F.3d 437, 440 (7th Cir. 2019) (felon challenging federal and state statutes prohibiting him from owning a firearm), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111; *Ezell v. City of Chicago*, 651 F.3d 684, 693 (7th Cir. 2011) (firing range facilities supplier challenging ordinance banning ranges within city limits). Instead, Holden chose to lie about his pending charge and then attempt to invoke Section 922(n)'s alleged unconstitutionality. Courts have long declined to reward such an approach.

There is simply no "privilege to lie in response to an improper interrogation." *Hill v. Murphy*, 785 F.3d 242, 248 (7th Cir. 2015). For this reason, courts have "without exception allowed sanctions for false statements or perjury" even when the defendant alleges "that the Government exceeded its constitutional powers in making the inquiry." *United States v. Mandujano*, 425 U.S. 564, 577 (1976) (plurality opinion) (upholding perjury conviction for statement defendant made to grand jury in alleged violation of Fifth

Amendment). One who employs intentional lies "as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Dennis v. United States*, 384 U.S. 855, 867 (1966).

*Dennis* well illustrates the rule. There, the defendants, Communist party members, could not raise a First Amendment challenge to their convictions for lying about their party membership on a government form. *Dennis*, 384 U.S. at 866-867. The rule applies regardless of the particular statute or constitutional provision at issue. See, *e.g.*, *Kay v. United States*, 303 U.S. 1, 6 (1938) (declining to review claim that Congress lacked constitutional authority to enact the Home Owners' Loan Act of 1933 raised by defendants who made false statements in violation of the act); *United States v. Moore*, 446 F.3d 671, 682 (7th Cir. 2006) (declining to decide if HUD regulation was unconstitutionally vague where defendant intentionally failed to disclose information to HUD); *United States v. Lawton*, 366 F.3d 550, 553-554 (7th Cir. 2004) (declining to decide if 18 U.S.C. § 922(n) was unconstitutional where defendant made false statements with respect to firearms records, in violation of 18 U.S.C. § 924(a)(1)(A)).

The rule applies even when Congress requires that, for conviction, a defendant's false statement must be "material." For example, in *United States v. Kapp*, 302 U.S. 214, 215-217 (1937), the defendant was charged with

willfully concealing a material fact in violation of the Agricultural Adjustment Act. The district court held the act void and then dismissed the indictment on the ground that "the facts alleged … had ceased to be material because of the unconstitutionality of the provisions." *Id.* at 217. But the Supreme Court reversed, concluding that the defendant could not attack the statute's constitutionality in a false statements prosecution because "Congress was entitled to protect the government against those who would swindle it regardless of questions of constitutional authority." *Id.* at 218; see also *Bryson*, 396 U.S. at 65 & n.1 (upholding conviction of defendant who lied about Communist party membership for concealing "a material fact" in violation of 18 U.S.C. § 1001).

## B.   Nothing in the Second Amendment or the text of 18 U.S.C. § 922(a)(6) counsels a different result here.

Holden's case falls within the well-established rule. He admitted he lied on ATF Form 4473 by declaring he was not under felony information. But the district court accepted Holden's claim that his lie should be excused as immaterial because the statutory prohibition on his acquisition of a firearm violated the Second Amendment. See App. 15 ("Mr. Holden wasn't prohibited from receiving a firearm under § 922(n), so his statement didn't concern a fact material to the lawfulness of the firearm sale.").

The above decisions reject the district court's reasoning. Holden was free to "decline to answer the question, or answer it honestly," *Bryson*, 396 U.S. at 72; and then sue if he was denied a firearm on the basis of his response or nonresponse. But he could not knowingly answer the question falsely and once caught raise a constitutional challenge "to the propriety of the very question." *Dennis*, 384 U.S. at 867.

Nothing about the Second Amendment would justify granting Holden an exception to the rule. *Bruen* was designed to subject the Second Amendment to the same "body of rules" as "other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156. As explained above, a defendant charged with making a false statement cannot defend on the ground that the query violated other Bill of Rights guarantees like the First or Fifth Amendment. There is no reason to allow a Second Amendment challenge either.

Nor does anything in the text of 18 U.S.C. § 922(a)(6) provide grounds for considering Holden's challenge. Neither Holden nor the district court have contended that Section 922(a)(6) is itself unconstitutional. Nothing in Supreme Court jurisprudence supports such a claim. The Second Amendment permits "presumptively lawful regulatory measures" designed to impose reasonable "conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-627 & n.26 (2008); *see, e.g., Teixiera v. County of Alameda*, 873 F.3d 670, 685 & n.18 (9th Cir. 2017) (discussing 17th

century colonial laws prohibiting residents from selling firearms to those outside the colony). Thus, consistent with the Second Amendment, the government can presumptively maintain records of firearms sales and prosecute those who introduce material falsehoods into those records. Although the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms for self-defense," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), it "doesn't give a person the right to lie to acquire a firearm." *Graham v. United States*, 2012 WL 611852, *3 (N.D. Ind. Feb. 24, 2012).

The district court rested its dismissal of the indictment on statutory construction grounds. It reasoned that, if Section 922(n) is unconstitutional, Holden's lie about being under indictment was not "material to the lawfulness of the sale" of the firearm, as Section 922(a)(6) requires. But the Supreme Court has refused to bar false statement prosecutions or consider underlying constitutional claims in at least two decisions involving similar "materiality" elements. See *Bryson*, 396 U.S. at 65 n.1; *Kapp*, 302 U.S. at 216. Thus, even though Section 922(a)(6) contains a materiality requirement, Holden still cannot defend himself against prosecution by alleging that the underlying requirement is unconstitutional.

With the question's constitutionality off the table, Holden's admitted conduct of answering the question falsely establishes his violation of Section

922(a)(6)'s text. The statute criminalizes false statements made in connection with acquiring a firearm "with respect to any fact material to the lawfulness of the sale … of such firearm … under the provisions of this chapter." 18 U.S.C. § 922(a)(6). In other words, the statute judges materiality not by reference to the Constitution or some other external source but instead by "the provisions of this chapter"—Chapter 44 of Title 18. See 18 U.S.C. §§ 921-934. Materiality is shown whenever "the false statement was intended to or likely to deceive the firearms dealer as to the lawfulness of the sale of the firearm." *United States v. Dillon*, 150 F.3d 754, 759 (7th Cir. 1998); see also *Abramski v. United States*, 573 U.S. 169, 188-189 (2014) (statute violated whenever "the sale could not have proceeded" and the firearms dealer "would have had to stop the transaction").

If Holden had answered truthfully, the sale "could not have proceeded." *Abramski*, 573 U.S. at 189. Chapter 44 makes it unlawful for anyone to knowingly sell a firearm to a person under indictment or information for "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(d)(1). Had Holden truthfully disclosed his pending felony battery charge, Chapter 44 would have compelled Worldwide to halt the transaction.

In sum, Holden's admitted acts establish that he made a false statement material to the lawfulness of the firearm's sale under Chapter 44. His lies, under binding Supreme Court precedent, preclude him from raising Chapter

44's constitutionality as a defense to his Section 922(a)(6) prosecution. The district court consequently lacked cause to dismiss the indictment.

## II.     Regardless, 18 U.S.C. § 922(n) Is Constitutional.

Even were this Court to review the district court's constitutional ruling on the merits, it should reverse. Section 922(n) is consistent with the Second Amendment's protections.

### A. The *Bruen* framework and burdens of proof.

The Second Amendment states in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (App. 18). Under *Bruen*, courts reviewing a claim that a law violates the Second Amendment ask two questions. First: Does the Second Amendment's plain text cover the conduct at issue? *Bruen*, 142 S. Ct. at 2126; see also *id.* at 2134-2135 (considering that first question as to the *Bruen* plaintiffs). If so, then second: Does the challenged law square with the nation's tradition of gun regulation? *Id.* at 2130; see also *id.* at 2135-2156 (considering the second question). At the second stage of the analysis, the government bears the burden of offering historical evidence to support the challenged law. *Id.* at 2126, 2130 (comparing *Bruen*'s test to the test for analyzing First Amendment free speech challenges).

*Bruen* did not decide who bears the burden on the first question since the parties there did not seriously dispute that the Second Amendment "right of

the people to keep and bear arms" plainly covered the law-abiding plaintiffs'
right to publicly carry handguns. *Id.* at 2134. Nevertheless, analogizing to the
First Amendment context, this threshold burden should rest with the
challenging party. This would align the burdens with the comparable ones in
the First Amendment context. There the government bears the burden of
justifying restrictions imposed on the freedom of speech, but it must shoulder
that burden only after the challenging party establishes that the First
Amendment applies. *Clark v. Community for Creative Non-Violence*, 486 U.S.
288, 294 n.5 (1984).

Similarly therefore, Holden bears the burden to show that the Second
Amendment applies to—and thus presumptively protects—his act of seeking
to acquire a firearm while under indictment, the conduct Section 922(n)
prohibits. As explained below, he cannot make this threshold showing because,
as an indicted person, he falls outside of the protections the Second
Amendment grants to law-abiding, responsible citizens.

**B. Because those under indictment are not "ordinary, law-abiding adult citizens," the Second Amendment does not presumptively protect their right to bear arms.**

Second Amendment rights are "not unlimited." *Heller*, 554 U.S. at 626.
"[T]he Second Amendment, like the First and Fourth Amendments, codified a
*pre-existing* right," neither "granted by the Constitution" nor "dependent upon
that instrument for its existence." *Heller*, 554 U.S. at 592. Thus, the right to

bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634-635.

The Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S. Ct. at 2131, quoting *Heller*, 554 U.S. at 635. That interest and the Second Amendment generally, however, do not restrict "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-627 & n.26; see also *McDonald v. City of Chicago*, 461 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" that governments may, consistent with the Second Amendment, prohibit felons and the mentally ill from possessing arms). These groups of people are excluded from the Second Amendment's protection because the Amendment codified a "right," belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; see also *Bruen*, 142 S. Ct. at 2111 (describing the "right of an ordinary law-abiding citizen to possess a handgun" both publicly and in the home "for self-defense").

Throughout *Bruen*, including in its concurring opinions, the Supreme Court repeatedly described the Second Amendment right as belonging only to "law-abiding citizens." See *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156; see also *id.* at 2157, 2158, 2159, 2161 (Alito, J., concurring); *id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring). In applying the framework it announced in *Bruen*, the Supreme Court addressed whether

petitioners were "ordinary, law-abiding adult citizens" in the section of its opinion (III.A) addressing the Second Amendment's textual scope, *see Bruen*, 142 S. Ct. at 2134-2135; not the later section (III.B) addressing historical tradition. It further noted that the two key metrics for assessing whether firearms regulations comply with the Second Amendment are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133; see also *Wrenn v. District of Columbia*, 864 F.3d 650, 663 (D.C. Cir. 2017) (suggesting laws comply with *Heller* if they "leave responsible, law-abiding citizens some reasonable means of exercising" the right to keep and bear arms); *but see United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240, *3-*4 (5th Cir. Feb. 2, 2023) (concluding the phrase "law-abiding, responsible citizens" was mere "shorthand," and that all members of the "political community," including lawbreakers, have a presumptive right to bear arms).

*Bruen* took specific care to clarify that nothing in the opinion was meant to cast doubt on the legality of the "shall-issue" licensing regimes then in place in 43 states that included background checks and other "narrow, objective and definite" requirements "designed to ensure only that those bearing arms in the jurisdiction are in fact 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); see also *id.* at 2161 (Kavanaugh, J., concurring). Many of these state regimes expressly disqualify those under indictment or information. See, *e.g.*, Ariz. Rev. Stat. § 13-311(E)(3); Ill. Comp.

Stat. 66/25(4); Ind. Code § 35-47-2-3(i)(5); Ky. Rev. Stat. § 237.110(4)(a); La. Stat. § 40:1379.3(C)(1); Tenn. Code § 39-17-1351(c)(7). By indicating that these regimes remain broadly constitutional (unless abused through "lengthy wait times .. or exorbitant fees [that] deny ordinary citizens their right to public carry," see *Bruen*, 142 S. Ct. at 2138 n.9), the Court reinforced that the Second Amendment's protections do not extend to people who are not law-abiding. Otherwise, each of the 43 "shall-issue" regimes could survive only if all of their many objective disqualifying criteria survive a case-by-case, historical inquiry. Such exacting scrutiny is flatly contrary to the Supreme Court's express declaration that it was casting no doubt on these regimes.

A conclusion that the Second Amendment's text covers only law-abiding citizens is also consistent with a host of pre-*Bruen* appellate court decisions. For example, *Medina v. Whitaker*, 913 F.3d 152, 157-158 (D.C. Cir. 2019), rejected a nonviolent felon's "as applied" challenge to the federal felon in possession statute. To determine the "public understanding" of the Second Amendment at the time of ratification, the D.C. Circuit considered evidence that the founders understood the right to bear arms to exclude "those who were not (or could not be) virtuous members of the community." *Id.*at 158-159. The court of appeals held that felons—violent or not—"are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 154; *accord United States v. Vongxay*, 594 F.3d 1111, 1115

(9th Cir. 2010) (holding that "felons are categorically different from the individuals who have a fundamental right to bear arms").

Courts have reasoned similarly for other groups classified as irresponsible or non-law-abiding. For instance, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011), rejected a challenge to 18 U.S.C. § 922(g)(8), which prohibits gun possession by people subject to domestic violence restraining orders. Relying on *Heller*'s description of the right to bear arms as protecting law-abiding citizens, the Eighth Circuit observed that the Supreme Court most likely viewed restrictions on gun possession by felons and the mentally ill "as presumptively lawful because they do not infringe the Second Amendment right." *Id.* at 1183. This rendered Section 922(g)(8) "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *Id.* at 1184; see also *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (refusing to apply Second Amendment to illegal aliens "because illegal aliens are not law-abiding members of the political community").

Like the above prohibitions, Section 922(n) does not contravene the Second Amendment because it places no burden on the rights of an "ordinary, law-abiding citizen." A citizen cannot be arrested on felony charges absent a showing of probable cause to believe he has not abided by the law. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Watson*, 423 U.S. 411, 415-416 (1976). Once probable cause is established, however, the suspected lawbreaker "may

face substantial liberty restrictions." *United States v. Salerno*, 481 U.S. 739, 749 (1987). He may be searched incident to his arrest. *United States v. Robinson*, 414 U.S. 218, 224-226 (1973). He may be strip searched once taken to jail. *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 322-323 (2012). He may be temporarily jailed pending arraignment based upon the government's "strong interest" in protecting the public from those "reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial adjudication." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). In some circumstances, a person charged with a crime can be denied bail and detained pending trial with his assets frozen, precluded from hiring Sixth Amendment counsel of choice. *Salerno*, 481 U.S. at 739; *Kaley v. United States*, 571 U.S. 320 (2014). Despite the First Amendment freedoms of speech and the press, those detained can be prohibited from receiving books and magazines from private parties. *Bell v. Wolfish*, 441 U.S. 540, 549-552 (1979).

Given that the needs of the criminal justice system can justify all these substantial restrictions and outweigh a criminal defendant's First, Fourth, Fifth, and Sixth Amendment rights, they can likewise outweigh a criminal defendant's Second Amendment rights. See *Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 2156 (emphasizing the Second Amendment is subject to the

same "body of rules" as "other Bill of Rights guarantees"). Thus, if an information found to be supported by probable cause is sufficient to trigger detention, see *Salerno*, 481 U.S. at 739; a seizure of assets, see *Kaley*, 571 U.S. at 327-328; and First Amendment restrictions, see *Bell*, 441 U.S. at 550; it is also sufficient to temporarily restrict the right to acquire firearms.

One district court applying *Bruen* to a charged defendant reached just that conclusion. See *United States v. Fencl*, No. 21-CR-3101, JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022)*, aff'd*, No. 22-50316 (9th Cir. Jan. 26, 2023) (opinion to follow). *Fencl* held that a pretrial release condition barring gun possession, 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment. *Ibid.* The court reasoned the defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause." *Ibid*. It rejected an appeal to the presumption of innocence, explaining this presumption "does not deprive the government of the ability to place significant, but temporary, restrictions on an accused's constitutional rights in order to further its interest in community safety." *Ibid* (citing *Salerno*, 481 U.S. at 748).

This Court should hold the same. Because Holden and others facing pending felony charges are not ordinary, law-abiding citizens, the Second Amendment does not preclude the government from imposing firearms

restrictions on that class of individuals. The district court erred in holding to the contrary.

### C. Section 922(n) is consistent with the nation's historical tradition of gun regulation.

Even if the Second Amendment's text were thought to cover defendants charged with felonies, 18 U.S.C. § 922(n) would still survive constitutional challenge under *Bruen* because it squares with historical tradition. When comparing modern and historical gun laws, courts often must "reason[ ] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2131 (quotation marks omitted). *Bruen* offered no "exhaustive survey of the features that render regulations relevantly similar," but it established as the central inquiry "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In conducting this historical inquiry, the Court must give greatest weight to the laws of "the Colonies and early Republic," as well as to the period of English law between 1660 and 1688. *Bruen*, 142 S. Ct. at 2140-2142.

"[A]nalogical reasoning" is not "a regulatory straightjacket." *Ibid.* It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Ibid* (emphasis in original); see also *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol,*

*Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated in part on other grounds by Bruen*, 142 S. Ct. at 2111 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue.") "So, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, *2 (M.D. Tenn. Nov. 16, 2022) (upholding § 922(n)). This is "because a list of laws that *happened to exist* in the founding era is, as a matter of basic logic, is not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Ibid* (emphasis in original).

Three distinct historical threads sustain the restrictions Section 922(n) imposes on those with pending felony charges: (1) liberty restrictions on indicted defendants, including pretrial detention; (2) laws restricting the gun rights of groups deemed dangerous or untrustworthy to obey the law; and (3) surety laws restricting the gun rights of people accused of posing a threat. In *Bruen*'s wake, district courts have held each of these three sets of laws

sufficiently analogous to establish a tradition supporting the imposition of modern gun restrictions on indicted defendants. See *United States v. Rowson*, 2023 WL 431037, at *21-*24 (S.D.N.Y. Jan. 26, 2023); *Fencl*, 2022 WL 17486363, at *3; *United States v. Perez-Garcia*, No. 22-CR-158-GPC, 2022 WL 17477918, at *4-5 (S.D. Cal. Dec. 6, 2022); *Kelly*, 2022 WL 17336578, at *5; *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2-3 (W.D. Pa. Oct. 6, 2022); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519, at *4-5 (W.D. Okla. Aug. 29, 2022).

### i. Section 922(n) is analogous to historical laws detaining indicted defendants prior to trial.

Consistent with the Constitution, legislatures can deprive indicted defendants of their liberty. A "fundamental right to bail was not universal among the colonies or among the early states." *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981); see also *United States v. Perry*, 788 F.2d 100, 111 (3rd Cir. 1986)(observing that most "federal courts that have addressed the issue have held that there is no absolute right to bail"). While the Eighth Amendment forbids excessive bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Ibid.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed." *Ibid.* Indeed, if it

chose, "Congress may ban bail in an entire class of cases." *United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010).

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"—and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); *Slye*, 2022 WL 9728732, at *2 ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law."). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which case it shall not be admitted but by [a court or judge] who shall exercise his discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Ibid.*

At the founding, moreover, capital cases encompassed a broad swath of criminal conduct. Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *Furman v. Georgia*,

408 U.S 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion"). "Capital punishment for felonies was 'ubiquit[ous]' in the late Eighteenth century and was 'the standard penalty for all serious crimes.'" *Medina*, 913 F.3d at 158, quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment).

The historical tradition of detaining those charged with serious crimes supports Section 922(n)'s restriction on those individual's right to receive guns. The power to detain necessarily encompasses the power to impose some lesser liberty restrictions. Thus, for example, the Supreme Court has reasoned that "'it would be odd to conclude'" that the government cannot seize forfeitable assets on a grand jury's probable cause finding when that showing is "often sufficient to 'restrain *persons*.'" *Kaley*, 571 U.S. at 330 (quoting *United States v. Monsanto*, 491 U.S. 600, 615 (1989)) (emphasis in original); see also *Stephens*, 594 F.3d at 1039 (reasoning that Congress's power to ban bail implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" of a curfew and electronic monitoring). In the same way, it would be odd to conclude that being charged with a crime can justify pretrial detention and the freezing of forfeitable assets but cannot justify a temporary restriction on receipt of a firearm.

Thus, applying *Bruen*, some district courts have upheld gun restrictions placed on charged felony defendants based on the nation's historical tradition of pretrial detention. In *Slye*, the district court rejected a Second Amendment challenge to a "standard condition" prohibiting a pretrial releasee from possessing a gun. *Slye*, 2022 WL 9728732, at *2-3. The court explained that "[i]t would be illogical to conclude" that it had authority to detain the defendant "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* at *2; see also *Fencl*, 2022 WL 17486363, at *3 (upholding 18 U.S.C. § 3142(c)(1)(B)(viii) based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)"). This Court should similarly deem Section 922(n) sufficiently analogous to historical laws allowing pretrial detention and uphold its constitutionality.

Admittedly, legislatures frequently grant courts discretion in deciding whether to detain indicted defendants, while Section 922(n) categorically restricts the right to ship, transport, or receive (though not to possess) firearms. Still, the historical power of legislatures to define bailable crimes, and thus "ban bail in entire classes of cases," shows constitutional tolerance of at least some categorical restrictions. *Stephens*, 594 F.3d at 1039 (rejecting facial challenge to Adam Walsh Act's mandatory curfew and electronic

monitoring conditions); see also *United States v. Peeples*, 630 F.3d 1136, 1138-1139 (9th Cir. 2010) (same as to both facial and as applied challenges).

Nothing in the Fifth Circuit's recent decision in *Rahimi* casts doubt on the argument that Section 922(n) is a permissible analogue to the nation's long history of pretrial liberty restrictions. *Rahimi* found unconstitutional 18 U.S.C. § 922(g)(8)'s prohibition on gun possession by those subject to domestic violence restraining orders. *Rahimi*, 2023 WL 1459240, at *1. Section 922(n) bars a much narrower class of conduct: the receipt of new guns by those facing potential imprisonment on felony charges. A separate concurrence in *Rahimi* observed that the government can permissibly detain—and thus disarm—citizens under principles applicable to those accused of a crime. *Id.* at *11 (Ho, J., concurring) (citing *Salerno*, 481 U.S. at 755). Section 922(n) restricts an accused's gun rights consistent with that principle. The government's nonpunitive regulatory interest in preventing a criminal defendant from seeking out guns while felony charges pend outweighs the defendant's liberty interest in accessing guns. *Salerno*, 481 U.S. at 749; see also *Kaley*, 571 U.S. at 329 (holding that an indictment may "serve the purpose of immediately depriving the accused of her freedom"). *Bruen* did not overrule this bedrock framework for assessing pretrial liberty restrictions on constitutional rights.

Ultimately, Section 922(n) imposes a lesser burden on an indicted defendant than does pretrial detention. See *Bruen*, 142 S. Ct. at 2133

(explaining that a central consideration in analogical reasoning is whether the historical restriction comparably burdens the right to armed self-defense). Pretrial detention strips a defendant of all Second Amendment rights and severely restricts other "core constitutional rights," like freedom of speech, freedom of association, and reasonable privacy expectations. *Slye*, 2022 WL 9728732, at *2 & n.4. In contrast, Section 922(n) imposes "a much narrower prohibition on obtaining new weapons during the period of time in which a person is the subject of an active felony prosecution." *Kelly*, 2022 WL 17336578, at *6. That narrow prohibition squares with the historical tradition of severely restricting indicted defendants' liberties and thus survives *Bruen* scrutiny.

### ii. Section 922(n) is analogous to historical laws disarming dangerous or untrustworthy people.

Both England and early America restricted the gun rights of some to protect the safety of all. In 1662, England empowered officers to "seize all Arms in the custody and possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3 § 13 (1662). Going armed maliciously with the intent to terrify others was also a common law offense. *Bruen*, 142 S. Ct. at 2141, citing *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to

the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); see also *id.* at 259-261 (detailing this history).

Early America inherited the English tradition. "The historical record shows that gun safety regulation was commonplace in the colonies." *National Rifle Ass'n*, 700 F.3d at 200. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. Those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, *The Office and Authority of a Justice of Peace* 92 (1736)).

Before the Second Amendment's ratification, at least four colonies had codified the common law prohibition of going armed offensively and authorized arrest for that crime. See 1 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New Hampshire: In New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131-132 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786). Three of those statutes (all but North Carolina's) required forfeiture of the offender's weapons. More such statutes

were enacted post-ratification. See, *e.g.*, A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99-100 (1836) (1801 statute).

Also "noteworthy" among "revolutionary and founding era gun regulations are those that targeted particular groups for public safety reasons." *National Rifle*, 700 F.3d at 200. During the Revolutionary War, at least six "jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance." *Ibid*; see 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

Moreover, several colonies completely banned slaves and Native Americans from owning guns. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022). While laws discriminating based on race or ethnicity are repugnant and would be unconstitutional today under the Equal Protection Clause or on other grounds, they nevertheless show a historical understanding

that legislatures could, consistent with the right to bear arms, impose broad status-based bans on firearm possession or acquisition.

Nothing in *Rahimi* is to the contrary. *Rahimi* found two "material differences" prevented treating historical laws disarming the dangerous as analogous to the modern disarmament of those subject to domestic violence restraining orders. *Rahimi*, 2023 WL 1459240, at *8. First, the historical laws "disarmed people by class or group, not after individualized findings of 'credible threats' to identified potential victims." *Ibid*. Second, their purpose was to preserve "political and social order," not to protect "an identified person from the specific threat posed by another." *Ibid*. Although the United States believes those distinctions should not have mattered and that *Rahimi* was wrongly decided, the fact remains that Section 922(n) compares more favorably to historical "dangerousness" laws in both respects. It restricts the whole class of people subject to felony indictment and is not dependent on individualized findings. Moreover, the restriction is meant to protect society at large, not a specific victim, from a defendant seeking out weapons during the narrow stressful period before charges are resolved.

Accounts of the ratification debates confirm the founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally." *National Rifle*, 700 F.3d at 200. "*Heller* identified … as a 'highly influential' 'precursor' to the

Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604). That report recognized the government could disarm the potentially dangerous, stating that "citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Skoien*, 614 F.3d at 640 (quoting 2 Bernard Schwarz, *The Bill of Rights: A Documentary History*, 662, 665 (1971)).

Similarly, Samuel Adams offered an amendment at the Massachusetts ratification convention recommending "that the said Constitution be never construed to authorize Congress to … prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, *The Bill of Rights*, 674-675, 681 (emphasis added) Thomas Cooley's treatise, cited in *Heller*, 554 U.S. at 616; later explained that some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley*, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

The tradition of disarming dangerous or untrustworthy persons supports Section 922(n)'s ban on indicted defendants' receipt of firearms. Section 922(n) is "relevantly similar" to these historical precursors under the "two metrics"

*Bruen* offered: "how and why the regulations burden" Second Amendment rights. *Bruen*, 142 S. Ct. at 2132-2133. As to "how" the statute operates, Section 922(n), like those precursors, uses an objective criterion to categorically restrict a specific group's gun rights. As to "why," Section 922(n) seeks "to combat violence and promote public safety" by "keeping firearms out of the hands of categories of potentially irresponsible persons." *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011) (ellipses omitted). Section 922(n) thus represents a permissible legislative judgment that a person's status as an indicted felon warrants temporarily precluding the person from acquiring new firearms.

### iii. Section 922(n) is analogous to historical surety laws.

Finally, traditional English and American surety laws support Section 922(n)'s constitutionality. In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated,* 142 S. Ct. 2895 (2022). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; … he may demand surety of the peace against such person." 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769).

The surety was "either a money payment or pledge by others 'in support of his future good conduct.'" *Young*, 992 F.3d at 791 n.12 (quoting David Feldman, *The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers*, 47 Cambridge L.J. 101, 104 (1988)). If the person against whom the accusation was made failed to "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." 4 Blackstone, at 252. The surety was "intended merely for prevention, without any crime actually committed the party, but arising only from a probable suspicion that some crime [wa]s intended or likely to happen." *Id.* at 249.

The colonies adopted English surety practice. See William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). For example, New Hampshire authorities could arrest a person who went armed in a threatening manner and "commit him to prison, until he the offender f[ound] such sureties as is required for his good behaviour." Acts and Laws of His Majesty's Province of New-Hampshire:  In New England 1-2 (1771) (1701 statute). Other early colonial laws contained similar provisions. See 1 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 52-53 (1869) (1692 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of

August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute).

The practice continued after the Second Amendment's adoption. In 1836, Massachusetts passed a law requiring anyone accused of breaching the peace to "post a bond before publicly carrying a firearm," absent some "special need for self-defense." *Bruen*, 142 S. Ct. at 2148 (citing Mass. Rev. Stat., ch. 134, § 16 (1836)). "Between 1838 and 1871, nine other jurisdictions adopted variations of the Massachusetts law." *Id.* at 2148 & n.23 (collecting citations).

The historical tradition of surety laws supports modern gun restrictions on indicted defendants. See *Fencl*, 2022 WL 17486363, at *3; *Perez-Garcia*, 2022 WL 17477918, at *4-5; *Kays*, 2022 WL 3718519, at *4-5. Like surety laws, Section 922(n) presumes people have a right to bear arms and burdens that right only upon a specific objective showing. *Id.* at *4. Even then, it restricts gun rights only temporarily, while the indictment is pending. *Ibid*; see 4 Blackstone at 249-250 (explaining that surety law restrictions applied only for a specified time). In other words, surety laws, like Section 922(n) imposed only "a conditional, partial restriction on the Second Amendment right," not "an absolute deprivation." *Rahimi*, 2023 WL 1459240, at *10.

Surety laws did generally require an individualized showing of threat or danger. *Bruen*, 142 S. Ct. at 2148. But a felony indictment serves an analogous

purpose. That is, Congress permissibly determined that an individualized showing that a person has been credibly accused of having committed a felony makes the person categorically more likely to misuse any firearms he newly acquires, warranting temporary restrictions. See *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942) (explaining that Section 922(n)'s predecessor statute applied to those who "demonstrated their unfitness to be entrusted with such dangerous instrumentalities.").

Like laws disarming dangerous or untrustworthy people, surety laws are "relevantly similar" to Section 922(n) under the *Bruen* "why" and "how" metrics. *Bruen*, 142 S. Ct. at 2132-2133. Both Section 922(n) and surety laws serve public safety purposes. See *Fencl*, 2022 WL 17486363, at *3 (upholding pretrial release condition). And they do so in the same manner: by "temporarily burdening the Second Amendment rights of individuals reasonably likely to breach the peace." *Ibid.*

For these same reasons, the district court was wrong to treat surety laws as materially different from Section 922(n). Surety laws required no specific level of proof and applied to anyone "reasonably accused." *Bruen*, 142 S. Ct. at 2148-2149. And like surety laws, which contain exceptions based on a special bond, Section 922(n) does not entirely ban publicly carrying firearms. Instead, it prohibits only "receipt" of new or additional guns while under felony charge, permitting a defendant to possess any guns already owned. Moreover, just as

an accused person could overcome the surety laws' restrictions by posting a bond, "§ 922(n) embeds its own mechanism for relief: resolution of the pending indictment." *Rowson*, 2023 WL 431037, at *24 (agreeing that surety laws are relevantly similar to Section 922(n)). In the end, surety laws and Section 922(n) address the same basic problem in analogous ways and provide sufficient historical analogue to uphold the modern statute.

### D. At minimum, 18 U.S.C. § 922(n) is constitutional facially and as applied to Holden.

When facing a criminal sanction, a defendant may normally contest a statute's constitutionality only on facial grounds. *Salerno*, 481 U.S. at 745. To prevail on a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Ibid.*

Whatever else one thinks of Section 922(n), it cannot be said that there are *no* circumstances under which it would be valid. The facts of Holden's case fully illustrate that point. As discussed above, surety statutes historically allowed the government to bar firearm possession by those "reasonably accused of intending to injure another or breach the peace." *Bruen*, 142 S. Ct. at 2148-2149. Moreover, the legislature has historically enjoyed the power to prohibit firearms possession by anyone who "shows a proclivity for violence." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).

Here, based on its issuance of an arrest warrant in response to the information and probable cause affidavit, an Indiana Court found probable cause to conclude that Holden committed a breach of the peace by battering a public safety officer. As a constitutional matter, he could have been held without bail pending trial. Moreover, under many colonial statutes, his breach of the peace would have justified disarming him as dangerous, untrustworthy, or a threat to the public. Nothing in the Second Amendment suggests that Section 922(n) cannot be applied to defendants who have been charged with violent felonies but granted bail pending trial.

Were the Court to consider Holden's as applied constitutional challenge, the same logic justifies rejecting his arguments. Consistent with the Second Amendment, Congress could bar Holden from acquiring a gun while he resolved the serious criminal charges pending against him. The statute is not unconstitutional as applied to him or to others similarly situated. For that reason, the district court should have denied Holden's constitutional challenge—however construed.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order dismissing the indictment and remand the case for further proceedings.

Respectfully submitted,

CLIFFORD D. JOHNSON
United States Attorney

DAVID E. HOLLAR
Assistant United States Attorney
Chief, Appellate Division

By:     /s/ David E. Hollar
_____
David E. Hollar
Assistant United States Attorney
United States Attorney's Office
Northern District of Indiana
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
(219) 937-5500

**RULE 32 CERTIFICATION**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9227 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Word word processing program, with fourteen point Century Schoolbook font.

                                                   /s/ David E. Hollar

                                                   David E. Hollar
                                                   Assistant United States Attorney

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned counsel for Appellant, hereby states that all of the

materials required by Circuit Rule 30(a) and 30(b) are included in the

Appendix to this brief.

Date:  February 9, 2023

                                       /s/ David E. Hollar
                                       David E. Hollar
                                       Assistant United States Attorney

**APPENDIX**

## TABLE OF CONTENTS TO APPENDIX

District Court Opinion and Order (R. 32) . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1

Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 18

18 U.S.C. § 922(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 19-20

18 U.S.C. § 922(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 21

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA,     )
                              )
                              )
          v.                  )      CAUSE NO. 3:22-CR-30 RLM-MGG
                              )
                              )
JOHN HOLDEN                    )

<u>OPINION AND ORDER</u>

John Holden entered a guilty plea to one count of making a false statement to obtain a firearm in violation of 18 U.S.C. § 922(a)(6). Mr. Holden now moves to withdraw his guilty plea and to dismiss the indictment, arguing that he's legally innocent in light of <u>New York State Rifle & Pistol Ass'n v. Bruen</u>, 142 S. Ct. 2111 (2022). For reasons explained in this opinion, the court grants Mr. Holden's motion to withdraw his plea of guilty and grants his motion to dismiss the indictment. [Doc. 24].

B<small>ACKGROUND</small>

John Holden visited Worldwide Jewelry & Pawn in August 2021 and attempted to acquire a firearm. Mr. Holden was under indictment[1] at the time,

---

[1]     Mr. Holden was under felony information in Indiana when he made the statement. For purposes of 18 U.S.C. § 922(n), "indictment" includes "an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted." 18 U.S.C. § 921(a)(14). The court refers to indictments in this opinion rather than differentiating between an information and an indictment.

so federal law prohibited him from receiving any firearm. *See* 18 U.S.C. § 922(n). Mr. Holden had to complete ATF Form 4473 to purchase the firearm. ATF Form 4473 asks whether the purchaser is under indictment and Mr. Holden answered "no." A grand jury later indicted Mr. Holden on one count of making a false statement intended and likely to deceive a licensed firearms dealer with respect to a fact material to the lawfulness of the sale of a firearm, in violation of 18 U.S.C. § 922(a)(6).

Mr. Holden was arrested in June 2022, the same month that the Supreme Court decided <u>New York State Rifle v. Bruen</u>, 142 S. Ct. 2111 (2022). The case clarified how to assess whether a law or regulation violates the Second Amendment. Mr. Holden, on advice of counsel, entered a guilty plea in August 2022. After his guilty plea but before sentencing, Mr. Holden sought and got replacement counsel. He then moved to withdraw his guilty plea and to dismiss his indictment. Mr. Holden argues that he has a complete defense to his § 922(a)(6) charge in the wake of <u>New York State Rifle v. Bruen</u>, so he should be able to withdraw his guilty plea and have the indictment dismissed.

Legal Standards

A defendant doesn't have an absolute right to withdraw a guilty plea, <u>United States v. Wallace</u>, 276 F.3d 360, 366 (7th Cir. 2002), but may withdraw a guilty plea after the court accepts the plea and before sentencing "if the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). Legal innocence may be a fair and just reason for

**APP. 2**

withdrawing a guilty plea. <u>United States v. Harper</u>, 934 F.3d 524, 528 (7th Cir. 2019). So, too, may ineffective assistance of counsel — ineffective assistance of counsel as to a guilty plea generally means the plea was entered involuntarily. <u>United States v. Wallace</u>, 276 F.3d at 366 (citing <u>Hill v. Lockhart</u>, 474 U.S. 52, 56 (1985)). A defendant receives ineffective assistance of counsel if the attorney's performance was objectively unreasonable, and the performance prejudiced the defendant. <u>Id.</u> (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

A defendant can move before trial to dismiss an indictment for failure to state an offense, Fed. R. Crim. P. 12(b)(3)(B). A defendant can move to dismiss for failure to state an offense on the basis that the charged offense is based on an unconstitutional statute. <u>United States v. Seuss</u>, 474 F.2d 385, 387 n.2 (1st Cir. 1973); <u>United States v. Stone</u>, 394 F. Supp. 3d 1, 8 (D.D.C. 2019).

Analysis

Mr. Holden argues that he should be able to withdraw his guilty plea because he received ineffective assistance of counsel and because his legal defense is a fair and just reason to withdraw his guilty plea. First, he contends that § 922(n)'s prohibition against receiving a firearm while under indictment violates the Second Amendment under <u>New York State Rifle v. Bruen</u>, 142 S. Ct. 2111 (2022). Then, he argues that because § 922(n) is unconstitutional, his false statement about whether he was under indictment doesn't concern a fact material to the lawfulness of a firearm sale. Without any false statement about

a fact material to the lawfulness of a firearm sale, Mr. Holden asserts that he's legally innocent of the crime charged and the indictment doesn't allege a crime.

### Whether § 922(n) is constitutional

After Mr. Holden was indicted and before he entered his guilty plea, the Supreme Court announced a new Second Amendment test in New York State Rifle v. Bruen, 142 S. Ct. 2111 (2022). Mr. Holden contends that § 922(n) can't survive the new test.

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The rights protected by the Second Amendment aren't solely collective rights relating to militia service, but are also individual rights. District of Columbia v. Heller, 554 U.S. 570 (2008).

After the Second Amendment was clarified as an individual right, courts generally coalesced around a two-step test for Second Amendment challenges to firearm regulations. First, if the government could show the regulated activity fell outside the scope of the Second Amendment as originally understood, the regulated activity was categorically unprotected, and the challenge failed. New York State Rifle v. Bruen, 142 S. Ct. at 2126 (citing Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019)). If historical evidence was inconclusive or suggested that the regulated activity wasn't categorically protected, courts proceeded to step two. Id. At step two, courts generally applied strict scrutiny analysis if the regulation burdened a core Second Amendment right, like the right to keep a

firearm at home for defense of the home. Id. A regulation that didn't burden a core part of the Second Amendment right received intermediate scrutiny. Id.

In New York State Rifle v. Bruen, the Court changed how courts evaluate Second Amendment challenges to firearms regulations. Courts no longer apply means-end scrutiny. Instead, if the Second Amendment's plain text covers some regulated conduct, "the Constitution presumptively protects that conduct." Id. The government may overcome this presumption only by "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127.

If the challenged regulation addresses a societal problem that's been around since the ratification of the Second Amendment, "the lack of a distinctively similar historical regulation addressing that problem" suggests the regulation doesn't fit in the history and tradition of firearm regulation, so is unconstitutional. Id. at 2131. In the same vein, if "earlier generations addressed the societal problem, but did so through materially different means," the regulation is probably unconstitutional. Id.

History guides the inquiry for regulations that would have been unimaginable at the Second Amendment's ratification, as well. Those regulations require a court to reason by analogy. Id. at 2132–2133. Courts must assess whether the challenged regulation is sufficiently analogous to a traditional regulation, paying particular attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2133. Reasoning by analogy "is neither a regulatory straightjacket nor a regulatory blank check." Id.

Though the government bears the burden of finding a sufficiently close analogy, it must only find "a well-established and representative *analogue*, not a historical *twin*." Id. (emphasis in original).

Ultimately, as understood in 2022, the Second Amendment protects rights that are "enshrined with the scope they were understood to have *when the people adopted them*." Id. at 2136 (citing District of Columbia v. Heller, 554 U.S. 570, 634–635 (2008)) (emphasis in original). It follows that post-enactment history clarifies the original public meaning of the Second Amendment, but less so with the passage of time and not at all when the text contradicts historical practice. Id. at 2136–2137.

Mr. Holden argues that § 922(n) poses a burden on his Second Amendment right to keep and bear arms and that the government can't justify the regulation by analogy or other historical comparison. The parties focus on whether the regulation is consistent with history and tradition, seemingly agreeing that the Second Amendment's text plainly covers the regulated activity – receiving a firearm. Receiving a firearm is necessarily a precursor to keeping or bearing a firearm, so Mr. Holden's conduct is presumptively protected by the Second Amendment. *See* United States v. Quiroz, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *3–4 (W.D. Tex. Sept. 19, 2022) (holding that "to keep and bear Arms" includes receiving arms); United States v. Kays, No. CR-22-40-D, 2022 WL 3718519, at *2–3 (W.D. Okla. Aug. 29, 2022).

The Second Amendment presumptively protects the regulated conduct, so the government must affirmatively show that § 922(n) fits in the history and

**APP. 6**

tradition of firearms regulations. <u>N.Y. State Rifle v. Bruen</u>, 142 S. Ct. at 2127. The government asserts that the Federal Firearms Act of 1938 provides historical support for § 922(n) because as far back as 1938, Congress restricted a person under indictment from shipping or transporting receipt of a firearm. Federal Firearms Act, Pub. L. No. 75-850, § 2(e), 52 Stat. 1250, 1251 (1938) (repealed).

That Congress limited firearm use by persons under indictment as far back as 1938 doesn't show that § 922(n) is constitutional. Post-ratification history is useful to understand the Second Amendment's original public meaning when it was ratified in 1791. <u>N.Y. State Rifle v. Bruen</u>, 142 S. Ct. at 2136–2137 (citing <u>District of Columbia v. Heller</u>, 554 U.S. 570, 605 (2008)). The more time that passes between ratification and a historical practice, the less insight the historical practice provides. <u>Id.</u> at 2137 ("As we recognized in <u>Heller</u> itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide us as much insight into its original meaning as original sources.' 554 U.S. at 614"). From 1791 to 1938 is wide enough a gulf that the Federal Firearms Act of 1938 doesn't shed much light on the original public meaning of the Second Amendment. <u>United States v. Quiroz</u>, 2022 WL 4352482, at *5 ("Yet the Government fails to explain why regulations enacted less than a century ago count as 'longstanding.'").

Next, the government cites surety laws as an analog to § 922(n). Several states adopted surety laws in the mid-19th century as a way of limiting dangerous persons' access to weapons. <u>N.Y. State Rifle v. Bruen</u>, 142 S. Ct. at

**APP. 7**

2148. Surety laws prohibited a person from carrying a weapon if there was reasonable cause to believe that person posed a risk of injury or breach of the peace. Id. The regulated person could overcome the prohibition if he showed an individualized need to carry a weapon for self-defense, or if he posted a bond. Id.

The government contends that surety laws support § 922(n) in two ways. Just as surety laws regulated potentially dangerous persons, § 922(n) regulates potentially dangerous persons – they only apply to persons under indictment and the pendency of an indictment is a volatile period. United States v. Kays, 2022 WL 3718519, at *4–5. Section 922(n) also poses less of a burden than surety laws; while surety laws regulated mere carrying of a weapon, § 922(n) prohibits only receipt of a firearm. Id. A person under indictment can still possess a firearm so long as he received it before coming under indictment.

Mr. Holden contests the government's analogy to surety laws. He emphasizes that even if § 922(n) and surety laws address the same problem of dangerous or volatile persons, § 922(n)'s restriction is absolute whereas surety laws' prohibition could be overcome. See United States v. Quiroz, 2022 WL 4352482, at *7–8. A person shown to be dangerous could nonetheless carry a weapon by showing an individual need for armed self-defense or by posting a bond. This difference would show that "earlier generations addressed the societal problem, but did so through materially different means," which is "evidence that [the] modern regulation is unconstitutional." N.Y. State Rifle v. Bruen, 142 S. Ct. at 2131. Section 922(n)'s burden is even starker, by Mr. Holden's estimation, because indictments are issued by grand juries, and those grand juries issue

**APP. 8**

indictments in non-adversarial proceedings. Surety laws, on the other hand, allowed a person to challenge the restriction by showing an individualized need or posting a bond. *See* <u>United States v. Quiroz</u>, 2022 WL 4352482, at *7–8.

The court agrees with Mr. Holden that § 922(n) is meaningfully different than surety laws, so surety laws don't provide the historical support needed to sustain § 922(n). A court analogizing to historical regulations primarily considers whether the modern and historical burden pose comparable burdens on the right of armed self-defense and whether the burden is comparably justified. <u>N.Y. State Rifle &. Bruen</u>, 142 S. Ct. at 2133. Surety laws restricted firearm possession for dangerous persons but their prohibition was surmountable: the regulated person could bear a firearm if he had an individualized need for self-defense or if he posted a bond. Section 922(n) imposes an absolute prohibition. Anyone under indictment is prohibited from receiving a firearm no matter how grave their need for armed self-defense and no matter their willingness and ability to pay a bond. Although an analogy needn't be a "historical twin" and the government's burden isn't a "regulatory straightjacket," the difference between surety laws and § 922(n) is substantial because the laws address the same societal problem of dangerous and volatile persons through materially different means. The analogy serves as evidence that the modern regulation is unconstitutional. <u>Id.</u> at 2131.

The government raises other arguments in favor of § 922(n)'s constitutionality, but none show that § 922(n) survives the Second Amendment challenge. The government argues that § 922(n) is narrowly tailored because it

**APP. 9**

prohibits only receipt of a firearm while under indictment, not the public carrying of a firearm. To the extent this argument addresses means-end scrutiny (it seems to overlap with the comparison of surety laws' burden with § 922(n)'s burden), it is irrelevant since means-end scrutiny isn't a part of the historical inquiry, even if earlier Second Amendment tests included means-end scrutiny. Id. at 2129–2130. The government adds that New York State Rifle v. Bruen only addressed a different sort of firearm regulation under New York law, so it doesn't § 922(n)'s validity See id. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."). But the majority's holding didn't only address a New York law; it clarified how courts must analyze all Second Amendment challenges to firearms regulations. See id. at 2127. This court can't disregard a new Second Amendment framework merely because it came from a challenge to a different law.

Section 922(n) burdens activity protected by the Second Amendment, and the government hasn't shown that the regulation is consistent with the history and tradition of firearm regulation that "delimits the outer bounds of the right to keep and bear arms." Id. Under the new Second Amendment standard, § 922(n) is unconstitutional.

*Whether § 922(n)'s unconstitutionality is material to § 922(a)(6)*

Mr. Holden's claim of innocence and argument for dismissal then turn on whether the unconstitutionality of § 922(n) is material for purposes of his §

922(a)(6) charge. Mr. Holden was indicted for making, in connection with the acquisition of a firearm, a false statement intended or likely to deceive the firearm dealer "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm." 18 U.S.C. § 922(a)(6). Mr. Holden falsely claimed he wasn't under indictment, but Mr. Holden argues that if § 922(n) is unconstitutional, his false statement is immaterial to the lawfulness of the sale.

The government argues that § 922(n)'s validity under the Second Amendment has no bearing on the § 922(a)(6) charge. The government describes § 922(a)(6) as regulating lying, not gun ownership. Some untold number of federal statutes and regulations depend on gun purchasers, sellers, and regulators having accurate information. Section 922(a)(6) maintains the integrity and effectiveness of the regulatory scheme by punishing and deterring lying. The government asserts that "Bruen no more impacts § 922(a)(6) as it would a prosecution for making a false statement to a federal law enforcement officer in violation of 18 U.S.C. § 1001."

The argument that § 922(a)(6) punishes lying takes too broad a view, missing the trees for the forest. Congress ostensibly has the authority to criminalize any sort of lie in connection with the acquisition of a firearm, *see* United States v. Lawton, 366 F.3d 550, 553 (7th Cir. 2004), but the law Congress wrote is narrower. Section 922(a)(6) doesn't prohibit any false statement in connection with the acquisition of a firearm – it prohibits a false statement intended to or likely to deceive "with respect to any fact material to the lawfulness of the sale" of a firearm. 18 U.S.C. § 922(a)(6). Mr. Holden is only criminally liable

**APP. 11**

under § 922(a)(6) for statements that deceive as to any fact material to the lawfulness of a firearm sale, not any false statement whatsoever. The court accepts the government's assertion that § 922(a)(6) is an important part of the regulatory scheme, but § 922(a)(6)'s purpose doesn't allow for prosecution of false statements that don't otherwise meet § 922(a)(6)'s requirements.

The government further contends that Mr. Holden's indictment and guilty plea are supported because § 922(a)(6) has withstood challenges before. For instance, the Supreme Court upheld § 922(a)(6) against a challenge involving the definition of "acquisition." Huddleston v. United States, 415 U.S. 814 (1974). The government doesn't explain, though, how that holding addresses Mr. Holden's unrelated challenge to the statute and indictment.

Second, our court of appeals rejected a challenge to a false statement conviction[2] premised on § 922(n)'s prohibition in United States v. Lawton, 366 F.3d 550 (7th Cir. 2004). In upholding the conviction, the court explained that "an individual may be prosecuted for knowingly making a false statement on a matter within the jurisdiction of the government, even if there are doubts about the government's authority to pose the inquiry giving rise to that statement." Id. at 553. The court also rejected a constitutional challenge to the conviction, explaining that whatever individual rights the Second Amendment might protect, the government has the authority to subject those rights to "reasonable

---

[2]     The defendant in United States v. Lawton was convicted of making a false statement to a licensed firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A), not 18 U.S.C. § 922(a)(6).

**APP. 12**

restriction." Id. at 554 (citing United States v. Emerson, 270 F.3d 203, 260–261 (5th Cir. 2001)).

Mr. Holden's circumstances are different. The Lawton court considered a § 924(a)(1)(A) conviction, which prohibits different conduct than § 922(a)(1). Section 924(a)(1)(A) prohibits "knowingly mak[ing] any false statement or representation with respect to the information required by [18 U.S.C. § 921 et seq.] to be kept in the record of [a licensed firearms dealer]." 18 U.S.C. § 924(a)(1)(A). That's a potentially broader class of statements than the statements that are regulated by § 922(a)(6), and that broader class of statements sweeps in a broader class of conduct than does § 922(a)(6). The court also considered the constitutional challenge long before New York State Rifle v. Bruen, much less District of Columbia v. Heller. The court concluded that any Second Amendment rights could be subject to "reasonable restriction." United States v. Lawton, 366 F.3d at 554 (citing United States v. Emerson, 270 F.3d 203, 260–261 (5th Cir. 2001)). It's now obvious that a challenge to a firearm regulation must undergo a more demanding inquiry under New York State Rifle v. Bruen.

Finally, the government asserts that Mr. Holden's argument amounts to saying that "all's well that ends well," but that the Supreme Court has rejected that defense to § 922(a)(6) prosecutions before. See Abramski v. United States, 573 U.S. 169 (2014). In Abramski v. United States, the defendant was convicted of a § 922(a)(6) violation after he bought a gun for his uncle and falsely stated to the firearms dealer that he, not his uncle, was the true purchaser. The defendant argued the false statement wasn't about "any fact material to the lawfulness of

**APP. 13**

the sale," because both he and his uncle could lawfully purchase the gun. The court rejected that argument, explaining that even though the true answer to the question wouldn't make the sale unlawful, the fact was still material because the seller needed to know the fact of the purchaser's identity to determine the lawfulness of the sale. Id. at 188–190. The government says Mr. Holden's actions are no different – even if Mr. Holden could lawfully purchase a gun, he can't claim "all's well that ends well." *See* id. at 189.

This comparison doesn't quite hold up. The false statement in <u>Abramski</u> was material because the question of the purchaser's identity *could* yield an answer that would make the sale unlawful. It didn't in Mr. Abramski's case, but the sale would have been unlawful had Mr. Abramski bought the gun for a different uncle who was a convicted felon. *See* 18 U.S.C. 922(g)(1). The same is untrue for Mr. Holden. Section 922(n) violates the Second Amendment, so the question of whether the purchaser is under indictment could receive no answer affecting the lawfulness of the sale.[3] The question was material in <u>Abramski v. United States</u> because it could affect the lawfulness of the sale even if it didn't actually do so; the question here is immaterial because under no circumstances could it affect the lawfulness of the sale.

---

[3]     Another part of the statute, § 922(d)(1), might still render the sale of the firearm unlawful because it prohibits selling a firearm to someone who's known to be or should be known to be under indictment. 18 U.S.C. § 922(d)(1). The court raised this point without forewarning to counsel at the hearing on these motions. Although counsel provided helpful responses, the parties didn't raise any argument about § 922(d)(1) or have the opportunity to fully develop any such argument, so the court declines to consider how § 922(d)(1) might affect Mr. Holden's indictment and guilty plea.

Mr. Holden has shown that § 922(n) facially violates the Second Amendment, and he's shown that without § 922(n) prohibiting him from receiving a firearm under indictment, his false statement as to whether he was under indictment was immaterial for purposes of § 922(a)(6).

### *Whether Mr. Holden is entitled to relief*

Mr. Holden has shown "a fair and just reason" for withdrawing his guilty plea. Fed. R. Crim. P. 11(d)(2)(B). His arguments based on <u>New York State Rifle v. Bruen</u> provide a claim to legal innocence and depend on neither "the mere possibility of a change in Supreme Court precedent," <u>United States v. Mays</u>, 593 F.3d 603, 607 (7th Cir. 2010), nor a "development in non-binding authority such as a district court decision in another district." <u>United States v. Ensminger</u>, 567 F.3d 587, 592 (9th Cir. 2009). The new Second Amendment test is the law of the land and under that new standard, Mr. Holden can't be criminally liable under § 922(a)(6) for a statement that depends on the constitutionality of § 922(n).

Mr. Holden's indictment must be dismissed, too. A defendant may assert that a particular crime charged is unconstitutional and move to dismiss it on a Rule 12(b)(3) motion. <u>United States v. Underwood</u>, No. 1:20-CR-77-HAB, 2022 U.S. Dist. LEXIS 173857, at *3 (N.D. Ind. Sept. 26, 2022); <u>United States v. Seuss</u>, 474 F.2d 385, 387 n.2 (1st Cir. 1973). Assuming the facts alleged are true, the indictment doesn't state an offense because Mr. Holden wasn't prohibited from receiving a firearm under § 922(n), so his statement didn't concern a fact material to the lawfulness of the firearm sale. The indictment must be dismissed.

**APP. 15**

CONCLUSION

This opinion was drafted with an earnest hope that its author has misunderstood <u>New York State Rifle v. Bruen,</u> 142 S. Ct. 2111. If not, most of the body of law Congress has developed to protect both public safety and the right to bear arms might well be unconstitutional. For one constitutional reason or another, a similar fate has befallen several other laws that Congress adopted with beneficent purposes. But unlike those instances, the decimation of the nation's gun laws would arise from an assumption that our leaders and ratifying legislators in the late 1700s didn't foresee that their descendants might need a different relationship than the founders had between the federal government and the right to bear arms. Yet a glance at the Constitution they were amending shows that they could foresee the growth in population that would change the number of representatives to be elected, that future members of Congress might need higher pay, and that future states might aspire to join the union.

The United States Constitution, as amended and as imperfect as it was, is the legacy of those eighteenth-century Americans; it insults both that legacy and their memory to assume they were so short-sighted as to forbid the people, through their elected representatives, from regulating guns in new ways.

The role of a United States District Court is to apply the law as understood by the United States Supreme Court; today's ruling recognizes that role. But the author of this opinion retains hope that he hasn't accurately grasped the Supreme Court's understanding of the Second Amendment.

**APP. 16**

The court GRANTS Mr. Holden's motion to withdraw guilty plea and GRANTS Mr. Holden's motion to dismiss the indictment. Mr. Holden's plea of guilty is WITHDRAWN and the indictment DISMISSED.

SO ORDERED.

ENTERED: <u>October 31, 2022</u>

<u>/s/  Robert L. Miller, Jr.    </u>
Judge, United States District Court

**APP. 17**

**CONSTITUTION**                                                    **Amend. VI**

JOHN BLAIR—                    JAMES MADISON JR.              J. RUTLEDGE                    CHARLES PINCKNEY
                *North Carolina*                          CHARLES COTESWORTH PINCKNEY  PIERCE BUTLER
WM. BLOUNT                     HU WILLIAMSON                                       *Georgia*
RICHD. DOBBS SPAIGHT                                        WILLIAM FEW                     ABR BALDWIN
                *South Carolina*

## Articles in Addition to, and Amendment of, the Constitution of the United States of America, Proposed by Congress, and Ratified by the Legislatures of the Several States Pursuant to the Fifth Article of the Original Constitution

### ARTICLE [I]

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

### ARTICLE [II]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

### ARTICLE [III]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

### ARTICLE [IV]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### ARTICLE [V]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### ARTICLE [VI]

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

**Administration and Enforcement by Attorney General**

Pub.L. 90–618,Title I, § 103, Oct. 22, 1968, 82 Stat. 1226, as amended Pub.L. 107–296, Title XI, § 1112(s), Nov. 25, 2002, 116 Stat. 2279, provided that: "The administration and enforcement of the amendment made by this title [amending this chapter] shall be vested in the Attorney General."

Section 903 of Pub.L. 90–351 provided that: "The administration and enforcement of the amendment made by this title [enacting this chapter and provisions set out as notes under this section] shall be vested in the Secretary of the Treasury.".

**Modification of Other Laws**

Section 104 of Pub.L. 90–618 provided that: "Nothing in this title or the amendment made thereby [amending this chapter] shall be construed as modifying or affecting any provision of—

"(a) the National Firearms Act (chapter 53 of the Internal Revenue Code of 1954) [section 5801 et seq. of Title 26];

"(b) section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control; or

"(c) section 1715 of title 18, United States Code, relating to nonmailable firearms."

Section 904 of Pub.L. 90–351 provided that: "Nothing in this title or amendment made thereby [enacting this chapter and provisions set out as notes under this section] shall be construed as modifying or affecting any provision of—

"(a) the National Firearms Act (chapter 53 of the Internal Revenue Code of 1954); or

"(b) section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control; or

"(c) section 1715 of title 18, United States Code, relating to nonmailable firearms."

## § 922.   Unlawful acts

(a) It shall be unlawful—

(1) for any person—

(A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

(B) except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

(2) for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, except that—

(A) this paragraph and subsection (b)(3) shall not be held to preclude a licensed importer, licensed manufacturer, licensed dealer, or licensed collector from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received; and this paragraph shall not be held to preclude an individual from mailing a firearm owned in compliance with Federal, State, and local law to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector;

(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed deal-

er from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of this title, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty; and

(C) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States;

(3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;

(4) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

(5) for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale

or other disposition of such firearm or ammunition under the provisions of this chapter;

(7) for any person to manufacture or import armor piercing ammunition, unless—

(A) the manufacture of such ammunition is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

(B) the manufacture of such ammunition is for the purpose of exportation; or

(C) the manufacture or importation of such ammunition is for the purpose of testing or experimentation and has been authorized by the Attorney General;

(8) for any manufacturer or importer to sell or deliver armor piercing ammunition, unless such sale or delivery—

(A) is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

(B) is for the purpose of exportation; or

(C) is for the purpose of testing or experimentation and has been authorized by the Attorney General; [1]

(9) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—

(1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

(2) any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance;

(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

(4) to any person any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity; and

(5) any firearm or armor-piercing ammunition to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, licensed dealers, and licensed collectors. Paragraph (4) of this subsection shall not apply to a sale or delivery to any research organization designated by the Attorney General.

(c) In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if—

(1) the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are . . . . . . . . . . . . . . .

Signature . . . . . . . . Date . . . . . . . ."

and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

(2) the transferor has, prior to the shipment or delivery of the firearm, forwarded by registered or certified mail (return receipt requested) a copy of the sworn statement, together with a description of the firearm, in a form prescribed by the Attorney General, to the chief law enforcement officer of the transferee's place of residence, and has received a return receipt evidencing delivery of the statement or has had the statement returned due to the refusal of the named addressee to accept such letter in accordance with United States Post Office Department regulations; and

(3) the transferor has delayed shipment or delivery for a period of at least seven days following receipt of the notification of the acceptance or refusal of delivery of the statement.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer, together with evidence of receipt or rejection of that notification shall be retained by the

Case: 22-3160  Document: 8  Filed: 02/09/2023  Pages: 76

intimate partner or child that would reasonably be expected to cause bodily injury; or

(9) who has been convicted in any court of a misdemeanor crime of domestic violence,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

(h) It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment—

(1) to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

(2) to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

(i) It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

(j) It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

(k) It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

(*l*) Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

(m) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

(n) It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

(*o*)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

(p)(1) It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm—

(A) that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

(B) any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

(2) For purposes of this subsection—

(A) the term "firearm" does not include the frame or receiver of any such weapon;

(B) the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and

(C) the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is—

(i) constructed of, during the 12–month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17–4 PH stainless steel in a shape resembling a handgun; and

(ii) suitable for testing and calibrating metal detectors:

*Provided, however,* That at the close of such 12–month period, and at appropriate times thereafter the Attorney General shall promulgate regulations to permit the manufacture, importation, sale, shipment, delivery, possession, transfer, or receipt of firearms previously prohibited under this subparagraph that are as detectable as a "Security Exemplar" which contains 3.7 ounces of material type 17–4 PH stainless steel, in a shape resembling a handgun, or such lesser amount as is detectable in view of advances in state-of-the-art developments in weapons detection technology.

(3) Under such rules and regulations as the Attorney General shall prescribe, this subsection shall not apply to the manufacture, possession, transfer, receipt, shipment, or delivery of a firearm by a licensed manufacturer or any person acting pursuant to a contract with a licensed manufacturer, for the purpose of examining and testing such firearm to determine whether paragraph (1) applies to such firearm. The Attorney General shall ensure that rules and regulations adopted pursuant to this paragraph do not impair the manufacture of prototype firearms or the development of new technology.

(4) The Attorney General shall permit the conditional importation of a firearm by a licensed importer or licensed manufacturer, for examination and testing to determine whether or not